IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NICHOLAS ZILLGES,                              Case No. 13-cv-1287-pp

                        Plaintiff,

v.

KENNEY BANK & TRUST, iTEAM COMPANIES INC.,
iSTREAM FINANCIAL SERVICES INC.,
KENNETH W. BIEL, THOMAS W. TICE,
JERRY GAGERMAN, KRIS AXBERG,
THOMAS ANDERSON, and ROBERT ATWELL,

                        Defendants.

**DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 70) AND PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (DKT. NO. 75)**

## I.     INTRODUCTION

This case turns on the question of whether plaintiff Nicholas Zillges was

a hero or a villain. Defendants Kenneth Biel, Thomas Tice, Jerry Gagerman,

Kris Axberg, Thomas Anderson, and Robert Atwell hired Zillges to correct

banking issues and to bring defendants Kenney Bank & Trust, iTeam

Companies Inc., and iStream Financial Services Inc. into compliance with state

and federal regulations. The relationship soured, however, resulting in the

plaintiff's termination. The parties do not agree on the reason for the

termination, or the motive of the terminating defendants. The plaintiff alleges

that the defendants terminated him for reporting violations to the FDIC, and

has filed a motion for partial summary judgment on three counts of his first

1

amended complaint and on all counts of iStream's counterclaim. The defendants, asserting that the plaintiff was terminated for making risky and unauthorized investments, filed a motion for summary judgment on all remaining counts of the plaintiff's first amended complaint. The court addresses both motions here, and finds that, for the most part, it is the province of a jury to determine which characterization of Zillges the facts support.

## II.    FACTS[1]

Defendant iTeam "is a bank holding company, incorporated in . . . Delaware" whose principal place of business is in Wisconsin. Dkt. No. 74 at ¶1. Defendant iStream is a Wisconsin corporation whose principal place of business is also in Wisconsin. Dkt. No. 74 at ¶2. iStream provides services to banks, including "remote deposit capture (RDC), automated clearing house (ACH) payments, check cashing, tax refund processing, remittance processing, and direct deposit services (iDD)." Id. It also provides services to non-profit organizations, corporate entities, and individuals. Id. iTeam holds 85% of iStream's stock. Dkt. No. 74 at ¶3. Defendant Kenney Bank & Trust (KBT) is "a

---

[1] The parties have filed competing findings of fact. The defendants filed proposed findings of fact in support of their motion for summary judgment, Dkt. No. 74, and the plaintiff responded to those facts, Dkt. No. 87. The defendants also filed proposed findings of fact to support their opposition brief to the plaintiff's motion for partial summary judgment, Dkt. No. 94, and the plaintiff responded to those facts, Dkt. No. 114. In support of his motion for partial summary judgment, the plaintiff filed proposed findings of fact, Dkt. No. 77, to which the defendants responded, Dkt. No. 96. Finally, the plaintiff filed proposed findings of fact to support his opposition brief to the defendants' motion for summary judgment, Dkt. No. 88, and the defendants responded, Dkt. No. 120. The facts section of this decision and order consists of undisputed facts from each of these documents, unless otherwise indicated.

2

federally insured bank chartered in Kenney, Illinois." Dkt. No. 74 at ¶4. It has a single branch in Kenney, Illinois, with its executive office is in Wisconsin. Id. KBT is owned by iTeam, Dkt. No. 74 at ¶75, and provides standard banking services to the "local . . . community,"Dkt. No. 74 at ¶6. iTeam purchased KBT "to facilitate iStream's payments processing business and never intended to own or run a standalone community bank." Dkt. No. 74 at ¶7.

While KBT employed the plaintiff, "defendant Kenneth Biel, now deceased, served as Chairman, President and CEO of iTeam and Chairman and CEO of iStream." Dkt. No. 74 at ¶9. "[D]efendant Thomas Tice served [as] Chairman of KBT and [as] a director of iTeam and iStream." Dkt. No. 74 at ¶10. "[D]efendant Jerome Gagerman served as a Director of KBT." Dkt. No. 74 at ¶11. "[D]efendant Kris Axberg served as CFO, Vice President, and Treasurer of iTeam, iStream, and KBT, and Director of KBT." Dkt. No. 74 at ¶12. "[D]efendant Anderson was a Director of iTeam and iStream." Dkt. No. 74 at ¶13. "[D]efendant Robert Atwell served as a Director of iTeam and iStream." Dkt. No. 74 at ¶14.

A.    The Consent Orders

On June 3, 2011, the FDIC and the State of Illinois Department of Financial and Professional Regulation, Division of Banking (IDFPR) (the regulators) "issued KBT a consent order relating to Bank Secrecy Act Violations and its involvement with Advent Financial Services, a high-risk tax refund service provider." Dkt. No. 74 at ¶25. On May 4, 2012, the regulators issued "a separate consent order relating to [KBT's] weak Compliance and Community

3

Reinvestment Act (CRA) rating." Dkt. No. 74 at ¶26. The consent orders
"directed KBT's board of directors to assume full responsibility for the approval
of sound policies and objectives and for the supervision of all of [KBT's]
activities, and to provide adequate oversight over [KBT's] third-party
relationships . . . ." Dkt. No. 77 at ¶18. The regulators issued another amended
consent order on October 29, 2013, dkt. No. 77 at ¶19, which "emphasized that
KBT needed to bring in qualified management to address the regulatory
problems." Dkt. No. 77 at ¶20.

      B.    <u>Hiring the Plaintiff</u>

On October 11, 2011, to comply with the order, the defendants hired the
plaintiff to work for KBT. Dkt. No. 74 at ¶19. During his employment, the
plaintiff served as a director, president, and CEO. Dkt. No. 74 at ¶18. Eleven
months into his employment, on August 8, 2012, the plaintiff and KBT entered
into an initial employment agreement. Dkt. No. 74 at ¶20. The parties signed a
revised version on September 19, 2012. <u>Id.</u> The relevant portions include
sections covering basic duties, the plaintiff's status as an "at will" employee,
compensation and benefits, a stock options agreement, and a termination
clause. Dkt. No. 74 at ¶21.

The plaintiff's "primary job duties included . . . overseeing [KBT's]
financial planning[,] budget management functions . . . , benchmarks for
measuring the financial[,] operating performance[,] . . . and financial analysis of
the [Asset/Liability Committee (ALCO)]." Dkt. No. 74 at ¶22. The duties also
included responsibility "for all regulatory compliance matters . . . and

4

communications with . . . regulators; lifting" consent orders, "and bringing KBT into full compliance with banking regulations." Dkt. No. 74 at ¶22.

According to iStream, in 2012 "the [r]egulators conducted two exams of" KBT. Dkt. No. 7 at 39. By that time, the regulators had already placed the bank under one consent order, and one of the 2012 exams determined whether or not the regulators would lift that order. Id. "The second [exam] was a Community Reinvestment Act (CRA) exam." Id. Because the bank did not do well on either exam, the first consent order remained in place and the regulators put a second consent order in place. Id.

The plaintiff and iStream entered into a Management Incentive Bonus Agreement on August 8, 2012. Dkt. No. 74 at ¶23. iStream and Zillges entered into the bonus agreement for the purpose of incentivizing Zillges' efforts to lift both consent orders. Dkt. No. 7 at 39-40. Under the terms of the agreement, the plaintiff would receive a "compliance bonus" if he brought KBT into compliance with various banking regulations and provisions. Dkt. No. 74 at ¶24. The plaintiff would receive "$50,000 upon the completion of 2012 . . . to be paid in four installments in 2013," and "two $30,000 compliance bonuses upon lifting, rescission, or other completion of the Consent Order[s]." Dkt. No. 35 at ¶148. The bonus agreement indicated that Zillges would not receive any bonus money unless "payable." Dkt. No. 74 at ¶24. The contract defined "payable" as "(i) all terms and conditions applicable to such bonus have been satisfied" by both parties and "(ii) [Zillges] has not sooner been terminated . . . for [c]ause nor resigned . . . without [g]ood [r]eason." Id.

5

The parties do not agree on whether or not the consent orders ever were lifted, or whether the plaintiff brought the defendants into compliance with the consent orders.

C.    The Purchase of Trust-Preferred Securities

A portion of the dispute focuses on the purchase of trust-preferred securities, or TruPS. On April 26, 2013, Jack Harrington, former Chairman of ALCO, purchased TruPS from Taylor Capital Group in an amount of $526,596.00. Dkt. No. 74 at ¶28. The purchase occurred "through broker FIG Partners." Dkt. No. 74 at ¶29. Subsequently, on May 28, 2013, ALCO "discussed" investing in Seacoast TruPS, but the committee did not approve the investment previously made by Harrington. Dkt. No. 74 at ¶¶31-32.

KBT had an "investment policy," that in relevant part "authorized" the president, vice president, and treasurer of KBT to "conduct investment transactions approved by" an internal committee. Dkt. No. 74 at ¶50. The policy also required the purchasing officer to conduct "a pre purchase analysis" and "present[] [it] to the Investment Committee." Id. In most instances, these investments required the authorization of the investment committee. Id.

"On June 20, 2013, Harrington purchased a second block of Taylor TruPS in the amount of $199,914.62 and a block of Seacost TruPS in the amount of $502,777.80." Dkt. No. 74 at ¶33. Harrington sought prior approval of these purchases "by telephoning" certain members of the defendant entities. Dkt. No. 74 at ¶39. At some point, Axberg received notice of the purchase and informed Tice, Dkt. No. 74 at ¶42, who "notified the remainder of the [iTeam]

6

Board of the purchase," Dkt. No. 74 at ¶43. These purchases "concerned" Anderson, because they "might hinder the sale of KBT." Dkt. No. 74 at ¶46. "Mike Steppe, KBT's investment advisor," even "recommended against purchasing the Seacoast TruPS." Dkt. No. 74 at ¶49. On July 1, 2013, in an email to the plaintiff, Tice questioned the TruPS purchases. Dkt. No. 74 at ¶64. The plaintiff responded, "[The] TruPS purchase was made as a policy exception and was documented as such and approved by ALCO." Dkt. No. 74 at ¶65. The parties do not agree to what extent the plaintiff was involved in these purchases, or if they contributed to his termination.

  D. <u>The Plaintiff's Communications with the FDIC</u>

  As president of KBT, the plaintiff had direct contact with the FDIC, and had a duty "to be honest and forthcoming with regulators on issues within the bank." Dkt. No. 88 at ¶8. This included "a duty to self-report and cure" any internal violations he discovered. Dkt. No. 88 at ¶9. "On February 26, 2012, Anderson, Biel, Tice, [and two non-defendants] held a meeting to discuss" some of the communications that the plaintiff had had with the FDIC. Dkt. No. 77 at ¶25. Those individuals expressed some concern "about the correspondence" and about the plaintiff's "behavior." Dkt. No. 77 at ¶26. In June of that year, "the iTeam Board discussed a proposal to limit" KBT's right "to communicate with the regulators without prior approval of the iTeam Board." Dkt. No. 77 at ¶28.

7

E.    The "Affiliate Business Feasibility Analysis"

On or about March 18, 2013, the plaintiff created an "Affiliate Business Feasibility Analysis." Dkt. No. 94 at ¶59. He asserted that the regulators required this analysis because they "continue[d] to have issues with the business model of the company and the philosophy of the holding company and how the bank is to be used." Dkt. No. 88 at ¶2. The plaintiff "shared" the report with the regulators, Dkt. No. 77 at ¶33, and "circulated" the document to KBT's Board of Directors. Dkt. No. 88 at ¶6. He described "it as a business model feasibility study," Dkt. No. 94 at ¶60, that "include[d] four budget models" that "show[ed] how KBT revenue would be positively impacted by changing to a direct service structure," Dkt. No. 94 at ¶62. The plan "assumed" that KBT "would have RDC customers" taken directly from iStream. Dkt. No. 94 at ¶62. KBT would "charge retail transaction fee rates to those customers," would keep the profit from those transactions, and "pay a small processing fee to iStream." Id. The plaintiff "submitted the feasibility analysis to the FDIC," and informed "the FDIC that the feasibility analysis demonstrated that KBT's relationship with iStream violated 23B" of the Federal Reserve Act. Dkt. No. 94 at ¶¶83-84. The Act prohibits transactions between banking affiliates from "exceed[ing] 20 per centum of the capital stock and surplus of the member bank." 12 U.S.C. §371c(a)(1)(B).

F.    The Regulators' Reports

In April of 2013, prior to the plaintiff's termination, the regulators "conducted a Safety and Soundness Exam," Dkt. No. 94 at ¶66, and on

8

June 14, 2013, "issued" an exam report, Dkt. No. 94 at ¶68. The regulators issued a similar report on October 22, 2014. Dkt. No. 94 at ¶73. One of these reports made a direct connection between "the 23B violation" and the plaintiff's feasibility report. Dkt. No. 88 at ¶15. According to the regulators' report, the feasibility "analysis 'effectively details the nontraditional activities still performed by the bank' and 'highlights the concerns that regulators have had [for] several years.'" Dkt. No. 88 at ¶16.

The findings in the report caused the regulators to "cite[] KBT for an apparent 23B violation as a result of its relationship with affiliated companies." Dkt. No. 77 at ¶36. This and further communications with the FDIC caused Biel and Anderson to become frustrated with the plaintiff. Dkt. No. 77 at ¶¶42-43. Tice even "prohibited" all "unauthorized communication of bank information by management or a director." Dkt. No. 77 at ¶44.

G.    The Plaintiff's Termination

On July 22, 2013, at a shareholder meeting for KBT, iTeam decided not to "re-slate Zillges or Harrington to the KBT board of Directors." Dkt. No. 94 at ¶¶42-43. Later that same day, iTeam and KBT held a joint meeting of their board of directors. Dkt. No. 74 at ¶70. "Tice opened the meeting by asking for Zillge's resignation," Dkt. No. 74 at ¶71, but the plaintiff did not resign, Dkt. No. 74 at ¶73. KBT subsequently voted to "terminate[] Zillges by a 3-2 vote." Dkt. No. 74 at ¶78. Tice, Axberg, and Gagerman voted in favor of terminating the plaintiff, and two non-defendants voted against termination. Dkt. No. 74 at ¶78. See also Dkt. No. 88 at ¶104. The parties do not agree on the basis for

9

termination. The defendants allege that they terminated the plaintiff due to unauthorized purchases of risky TruPS investments. Dkt. No. 74 at ¶¶63, 79-83. The plaintiff asserts that the defendants terminated his employment because he reported violations of banking law to the FDIC. Dkt. No. 88 at ¶¶21-22, 37, 43, 107-08.

The plaintiff's "employment . . . terminated on July 22, 2013." Dkt. No. 77 at ¶46. This occurred without "written notice identifying the precise nature of any alleged breach, violation or failure." Dkt. No. 77 at ¶47. No one on the KBT Board "identified the precise corrective measures" that the plaintiff could have taken to avoid termination. Id. The parties agree that any "alleged taking of an unauthorized bonus" by the plaintiff did not "factor in" his termination. Dkt. No. 77 at ¶68.

H.    Disputes Regarding the Consent Orders

The parties do not agree on the status of the consent orders at the time of the plaintiff's termination. They agree that the plaintiff's job included, and the bonus agreement turned on, the lifting of the May 4, 2012 and the November 13, 2012 consent orders. Dkt. No. 74 at ¶¶25-27. In June of 2013, the regulators informed KBT that it had "complied with the majority of the provision[s] in the Consent Order . . . issued on November 13, 2012 and it has served its purpose." Dkt. No. 77 at ¶76. The regulators asked the KBT board to sign a memorandum of understanding (MOU). Id. "Once . . . signed, the Order [would] be terminated." Id. The parties agree that the "Board signed the MOU," but they do not agree that the regulators ever officially lifted the November 13,

10

2012 consent order. Dkt. No. 77 at ¶87. Nor do they agree on whether or not the board ever sent a signed MOU or if the regulators ever received a signed MOU. The plaintiff did, however, receive "the Compliance Bonus of $30,000 pursuant to the . . . Bonus Agreement." Dkt. No. 77 at ¶90. After the plaintiff's termination, the regulators "downgrad[ed]" KBT's status and sent the defendants a letter that indicated that the consent order was still in place. Dkt. No. 77 at ¶¶92-93. The plaintiff alleges that he "took all necessary steps toward removing the [May 4, 2012] Consent Order," but that "[t]he FDIC left [it] in place because they did not trust the holding company and feared iTeam would revert to its previous practices if it was removed." Dkt. No. 88 at ¶¶137-38. The defendants assert that neither consent order "has [ever] been lifted." Dkt. No. 94 at ¶¶124-25.

The plaintiff asserts that, on June 14, 2013, he received a letter from the regulators, which indicated that KBT had "improved [its] risk profile and financial condition." Dkt. No. 76 at 16. As a result, the regulators asked KBT's board of directors to sign an MOU and return the original. Id. Once signed and received, the regulators, according to the letter, would lift the November 13, 2012 consent order, because the bank had "complied with the majority of the provisions in the Consent Order." Id. Zillges interpreted this as saying that KBT was "home free," which he asserts is why he told iStream that the regulators had lifted the order. Id. at 16-17. He acknowledges that by informing Axberg of the letter, Anderson began to pursue payment of the bonus. Id. at 17.

According to iStream, in June of 2013, "Zillges falsely represented to Axberg that the . . . Consent Order had been removed," knowing the statement was false, malicious, wanton or willful, and negligently or recklessly relayed the false information, because "he never sent the MOU to the [r]egulators." Id. According to iStream, the plaintiff did this "with the intent to deceive Axberg into approving payment of [the] bonus." Id. As a result of and in reliance on Zillges' statements, iStream paid the $30,000 bonus to Zillges, id. at 42, causing iStream to suffer damages of $30,000. Id. iStream asserts that it is "the rightful owner of the . . . bonus," and that Zillges converted for his own use the bonus money that he had improperly received. Id.

## III.  PROCEDURAL HISTORY

The plaintiff filed the initial complaint on November 14, 2013. Dkt. No. 1. On December 6, 2013, the defendants filed an answer (which included counterclaims by iStream and KBT), Dkt. No. 7, and a motion to dismiss for failure to state a claim, Dkt. No. 8. On December 27, 2013, the plaintiff answered the counterclaims, Dkt. No. 11, and a brief in opposition to the motion to dismiss, Dkt. No. 12. Also on December 27, 2013, the plaintiff filed a motion to amend the complaint in an attempt to correct the issues raised in the motion to dismiss. Dkt. No. 13. On January 8, 2015, KBT and the plaintiff stipulated to the dismissal of KBT's counterclaim. Dkt. No. 57. This left active only iStream's counterclaim.

On May 12, 2014, the plaintiff filed an expedited motion for leave to file a second amended complaint. Dkt. No. 26. On June 4, 2014, the court issued a

decision and order that addressed the defendants' motion to dismiss and both the plaintiff's first and second motions to amend the complaint. Dkt. No. 34. The court dismissed the plaintiff's claim for negligence (Count V). Id. The court granted the plaintiff's first motion to amend the complaint, denied the plaintiff's motion to file a second amended complaint, and granted in part the defendants' motion to dismiss. Id. As of June 4, 2014, then, the first amended complaint became the operative pleading. Dkt. No. 35.

The defendants answered the first amended complaint on June 18, 2014, Dkt. No. 38, but the answer did not specifically re-raise or re-plead the counterclaims. On the same day, KBT filed a motion to dismiss Count II (violation of the Consumer Financial Protection Act) of the first amended complaint for lack of jurisdiction. Dkt. No. 40. After the parties fully briefed the motion, Dkt. Nos. 48 and 49, the court granted the motion to dismiss Count II of the first amended complaint. Dkt. No. 51.

On January 7, 2015, the defendants filed a request that the court "declare that [their] counterclaims [were] properly before the court." Dkt. No. 53. With the motion, they sought to amend the answer as a form of alternative relief. Dkt. Nos. 54-55. On January 23, 2014, the plaintiff responded to the motion, Dkt. No. 59, and the defendants replied on February 6, 2015, Dkt. No. 81. On March 2, 2015, the court heard oral arguments, "adopted the functional approach," and "conclude[ed] that it [would] not require the defendants . . . to re-plead" the counterclaims. Dkt. No. 105 at 2-3. The court found "that the defendants' counterclaims were properly before the court." Id.

13

On April 16, 2015, the parties filed a stipulation, indicating that on February 25, 2015, iStream had made an offer of judgment to the plaintiff on the breach of contract claim in Count VII of the first amended complaint. Dkt. No. 125. The stipulation indicated that on March 10, 2015, the plaintiff had accepted the offer, and asked the court to enter judgment against iStream. Id. On April 17, 2015, the court accepted the parties' stipulation. On April 27, 2015, the plaintiff filed a notice of satisfaction of judgment, Dkt. No. 126, and, on May 19, 2015, the court approved the judgment, Dkt. No. 127.

On January 30, 2015, the defendants filed a motion for summary judgment on the remaining counts of the plaintiff's first amended complaint. Dkt. Nos. 70-71.[2] On January 30, 2015, the plaintiff filed a motion for partial judgment. Dkt. Nos. 75-76. He seeks summary judgment on Counts I, VI, and VII[3] of the first amended complaint and on all counts of iStream's counterclaim. This decision and order addresses both parties' motions for summary judgment.

## IV. ANALYSIS

### A. Choice of Law

The plaintiff resides in Wisconsin. The defendants KBT, iTeam, and iStream each have a principal place of business in Wisconsin. Defendants Biel, Axberg, and Atwell live in Wisconsin. Defendants Tice and Gagerman reside in

---

[2] The court previously dismissed Count V (negligence) and Count II (violation of the Consumer Financial Protection Act). The parties resolved Count VII (breach of contract against iStream). This order addresses the defendants' request for summary judgment on Counts I, III, IV, VI, VIII, IX and X.

[3] Because the parties have resolved Count VII by agreement, the court will not address the plaintiff's motion for summary judgment on that count.

14

Illinois. Defendant Anderson lives in Indiana. The parties have not addressed the issue of choice of law, but each cites Wisconsin law when arguing their motions. The court finds no basis to apply another state's law and will apply Wisconsin law. See FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 283 (7th Cir. 2002) (When "there's no discussion of choice of law issues, . . . we apply the law of the forum state.").

B.    Summary Judgment Standard

Fed. R. Civ. P. 56 governs motions for summary judgment. It allows a party to "move for summary judgment, identifying each claim or defense . . . on which" the party seeks summary judgment. Fed. R. Civ. P. 56(a). If the moving party can show "that there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law," the "court shall grant summary judgment," stating "on the record the reasons for granting or denying the motion." Id.

To prove that there are no genuine, factual disputes, the moving party must support the motion with "particular parts . . . in the record," such as "depositions, documents . . . affidavits or declarations, stipulations," etc. Fed. R. Civ. P. 56(c)(1)(a). The moving party may show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(b). The court, however, "may consider other materials in the record," and not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

15

In 1986, the Supreme Court decided two cases which provided guidance to the lower courts in determining whether genuine issues of material fact exist. First, in <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986), the Court noted "that a mere existence of some alleged factual dispute between the parties will not defeat" a motion for summary judgment. <u>Id.</u> at 247-48. The Court defined a "genuine" issue of fact as one for which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248. To defeat a motion, the non-moving party cannot "rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> The court must make "the threshold inquiry of determining whether there is the need for a trial." <u>Id.</u> at 250. <u>See also</u> <u>O'Leary v. Accretive Health, Inc.</u>, 657 F.3d 625 (7th Cir. 2011). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder." <u>Payne v. Pauley</u>, 337 F.3d 767, 770 (7th Cir. 2003) (citing <u>Anderson</u>, 477 U.S. at 255; <u>Betaco, Inc. v. Cessna Aircraft Co.</u>, 32 F.3d 1126, 1138 (7th Cir. 1994); and <u>Sarsha v. Sears Roebuck & Co.</u>, 3 F.3d 1035, 1041 (7th Cir. 1993)).

Second, in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the Supreme Court explained that Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." <u>Id.</u> at 322-23. "[A] complete failure of proof concerning an essential element of

Case 2:13-cv-01287-PP   Filed 09/29/15   Page 16 of 45   Document 128

the nonmoving party's case . . . renders all other facts immaterial." Id. The court must enter judgment for the moving party when "the nonmoving party has failed to make a sufficient showing on an essential element of her case." Id. See also O'Leary, 657 F.3d 625.

Civil Local Rule 56 for the Eastern District of Wisconsin provides additional guidelines for parties filing motions for summary judgment. It requires the moving party to file the following documents with its motion:

> (A) a memorandum of law; (B) a statement setting forth any material facts to which all parties have stipulated; (C) a statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law; and (D) any affidavits, declarations, and other materials.

Civ. L. Rule 56(b). Further, the opposing party has thirty days from service of the motion to file a response or objection, and the movant has fourteen days from service of the response to file a reply. Id. Finally, Civil Local Rule 7(e) allows the court to hear oral argument at its discretion. Civ. L. Rule 7(e).

    C.    <u>The court grants in part and denies in part the defendants' motion for summary judgment.</u>

        1.    There are genuine disputes of material fact regarding the plaintiff's claim in Count I that defendant KBT violated the Federal Deposit Insurance Act, and thus the court will deny the defendants' motion as to Count I.

In Count I of the amended complaint, the plaintiff alleges that defendant KBT violated the Federal Deposit Insurance Act. Dkt. No. 35 at 18. Chapter 16 of Title 12 of the United States Code created the Federal Deposit Insurance Corporation. 12 U.S.C. §§1811-1835a. The FDIC "insure[s] . . . the deposits of

17

all banks and savings associations which are entitled to the benefits of insurance under [Chapter 16]." 12 U.S.C. §1811(a). The plaintiff alleges that KBT violated 12 U.S.C. §1831j, which prohibits an "insured depository institution" from:

> discharg[ing] or otherwise discriminat[ing] against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee . . . provided information to any Federal banking agency or to the Attorney General regarding— a possible violation of any law or regulation; or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety; by the depository institution or any director, officer, or employee of the institution.

12 U.S.C. §1831j(a)(1).

The Whistleblower Protection Act governs "[t]he legal burdens of proof that prevail under" this section. 12 U.S.C. §1831j(f). The Whistleblower Protection Act states:

> [T]he [Merit Systems Protection Board] shall order such correction action as the Board considers appropriate if the employee, former employee, or applicant for employment has demonstrated that a disclosure or protected activity . . . was a contributing factor in the personnel action which was taken or is to be taken against such employee, former employee, or applicant. The employee may demonstrate that the disclosure or protected activity was a contributing factor in the personnel action through circumstantial evidence, such as evidence that—
>
> > (A) the official taking the personnel action knew of the disclosure or protected activity; and
> >
> > (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity

18

> was a contributing factor in the personnel
> action.

5 U.S.C. §1221(e)(1).

"Once a plaintiff makes out a prima facie case of retaliation under §1837j, the defendant must articulate, by clear and convincing evidence, a legitimate, non-discriminatory reason for the termination." Lippert v. Cmty. Bank, Inc., 438 F.3d 1275, 1279 (11th Cir. 2006).

The plaintiff has alleged that he "provided information to the FDIC regarding possible violations of law." Dkt. No. 35 at ¶106. The parties do not dispute that the defendants knew about these disclosures. The plaintiff alleges that, as a result of the disclosures, and in violation of 12 U.S.C. §1831j, defendant KBT fired the plaintiff.

In their motion for summary judgment, the defendants argue that KBT had other reasons for terminating the plaintiff. They state that "[t]he principal factor in the decision to request Zillges's resignation and subsequent termination was his involvement in the purchase of risky investments outside of and in violation of several provisions [of the] investment policy." Dkt. No. 72 at 15. They allege that "Tice voted to terminate [the plaintiff] because he no longer trusted Zillges," "Axberg also voted to terminate because of Zillge's conduct . . . and . . . shortcomings with respect to lending," and "Gagerman voted to terminate because he believed the relationship between the parties was irreparable." Id. at 14.

The parties clearly and genuinely dispute the justification or motive for the plaintiff's termination, which is material to the question of whether KBT

19

violated 12 U.S.C. §1831j. Because a genuine dispute as to a material fact exists, the court will deny the defendants' motion for summary judgment on Count I of the amended complaint.

The court notes that the defendants conclude their motion for summary judgment with a section asserting that the court "should declare that Zillges is not entitled to an award of attorneys' fees under 12 U.S.C. §1831j should he prevail in this litigation." Dkt. No. 72 at 29-30. They go on to state, "Zillges claims that he is entitled to an award of attorneys' fees under 12 U.S.C. §1831j even though the statute does not contain a fee shifting provision." The court has reviewed the prayer for relief in the amended complaint; the only reference to attorneys' fees is a general request for "all costs, disbursements and attorney's fees." Dkt. No. 35 at 26. The source of the defendants' claim that the plaintiff is seeking attorneys' fees under §1831j is not clear to the court.

Regardless, the court declines the invitation to issue a declaratory judgment on the question of attorneys' fees. Because the court is denying the parties' motions for summary judgment on several of the claims in the complaint, it is premature for the court to consider the plaintiff's general request for attorneys' fees, and the court will not consider a specific request under a specific statutory provision until the question of liability on that statutory provision has been established.

> 2. There are genuine disputes of material fact regarding the plaintiff's claim in Count III that defendants iTeam, iStream, Biel, Tice, Axberg, Anderson and Atwell conspired to injure his reputation and business, and thus the court will deny the defendants' motion as to Count III.

Count III of the first amended complaint alleges that defendants iTeam, iStream, Biel, Tice, Axberg, Anderson and Atwell conspired to injure the plaintiff's business. Dkt. No. 35 at 20. Wisconsin law prohibits two or more people from

> combin[ing], associate[ing], agree[ing], mutually undertak[ing] or concert[ing] together for the purpose of willfully or maliciously injuring another in his . . . reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his . . . will, or preventing or hindering another from doing or performing any lawful act.

Wis. Stat. §134.01. The Wisconsin Supreme Court first laid out the standards for a claim under Wis. Stat. §134.01 in <u>Radue v. Dill</u>, 74 Wis. 2d 239 (1976). To prove a claim under §134.01, "a plaintiff must prove that (1) the defendants acted together; (2) with a common purpose to injure the plaintiff's reputation or business; (3) with malice; and (4) the plaintiff suffered financial harm." <u>Virnich v. Vorwald</u>, 664 F.3d 206, 213 (7th Cir. 2011).

The plaintiff has asserted that "Biel, individually and as an agent of iTeam and iStream, induced members of the KBT Board to discharge and defame" the plaintiff. Dkt. No. 35 at ¶119. He alleges that "Tice, individually and as Chairman of KBT and pursuant to his dual persona as an iTeam Director, worked with Biel to secure Zillges' termination and defame him." <u>Id.</u> at ¶120. He asserts that "Axberg, individually and as Director of KBT and

21

pursuant to his dual persona as the CFO and Treasurer of iTeam, worked with other Defendants to secure Zillges' termination and voted in favor of [the] termination." Id. at ¶121. He also asserts that Anderson and Atwell "individually" and as "[d]irector[s] of iTeam, worked with other [d]efendant[s] to secure" the plaintiff's "termination." Id. at ¶¶122-23. The plaintiff argues that collectively, these actions constitute an effort to "scheme" and "act[] on wrongful motives to preclude [the plaintiff] from reporting activities to the FDIC." Id. at ¶124. He argues that the defendants "brought about [the] discharge in order to further their improper motive of preventing Zillges from dismantling the KBT-iStream relationship, reporting further violations to the FDIC, and realizing the stock options and other compensation he was due." Id. at ¶125. He asserts that the defendants' "willfull[] and malicious[]" actions "injured Zillges in his reputation, business, and profession," and caused him to "suffer[] damages, including loss of past and present earnings, stock options, and bonuses." Id. at ¶¶126-27.

In their motion for summary judgment, the defendants deny any wrongful motive in discharging the plaintiff, and deny any intent to injure him. They argue that "Zillges was terminated for his involvement in an out-of-policy and unapproved purchase of risky securities," and "the termination was lawful." Dkt. No. 72 at 19. The defendants assert that the corporate entities agreed to terminate the KBT-iStream "payments business." Id. at 19-20. They also argue that because they hired Zillges to be the liason with the FDIC, they "expected him to provide information and discuss regulatory issues with the

22

FDIC." Id. at 21. According to the defendants, "There is no evidence that any defendant expressed unwarranted dissatisfaction with any disclosure Zillges made to the FDIC." Id.

One of the elements of conspiracy to injure business requires the plaintiff to prove that the defendants did whatever they did "with a common purpose to injure the plaintiff's reputation or business." Virnich v. Vorwald, 664 F.3d 206, 213 (7th Cir. 2011). The above discussion demonstrates that the parties genuinely dispute the existence of any conspiratorial intent or motive to injure the plaintiff's business or reputation on the part of the defendants. And the determination of what the defendants intended, or whether they had a common purpose, requires a credibility determination. The Seventh Circuit has stated that such a determination is not appropriate at the summary judgment phase: "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder." Payne v. Pauley, 337 F.3d at 770. The court will deny the defendants' motion for summary judgment on Count III of the amended complaint.

3. There are genuine disputes of material fact regarding the plaintiff's claim in Count IV of the complaint that defendants iTeam, iStream, Biel, Tice, Gagerman, Axberg, Anderson and Atwell tortiously interfered with his prospective business, and thus the court will deny the defendants' motion for summary judgment as to Count IV.

In Count IV of the amended complaint, the plaintiff alleges that defendants iTeam, iStream, Biel, Tice, Gagerman, Axberg, Anderson and Atwell tortiously interfered with his prospective business. Dkt. No. 35 at 21. In

23

Wisconsin, the law relating to interference with a business relationship has been described in terms of an existing or prospective contractual relationship. Wisconsin Hous. & Econ. Dev. Auth. v. Tri Corp Hous., Inc., 334 Wis. 2d 809, ¶22 (Ct. App. 2011). "Wisconsin first adopted the cause of action for intentional interference with an existing contractual relationship in" 1960. Id. (citing Mendelson v. Blatz Brewing Co., 9 Wis. 2d 487, 491 (1960)). "In Mendelson, our supreme court adopted the original version of the Restatement (First) of Torts §766 (1939), which incorporated causes of action for existing and prospective contracts. Since then, the law of torts in Wisconsin . . . evolved to include intentional interference with business relationships . . . ." Wisconsin Hous., 334 Wis. 2d at ¶22.

To prove tortious interference with prospective business, the plaintiff must show "(1) a contractual relationship on behalf of the plaintiff; (2) knowledge by the defendant of the existence of the contractual relationship; (3) intentional acts on the part of the defendant to disrupt the relationship; (4) actual disruption of the relationship causing damages; and (5) lack of privilege or justification for defendant's interference." Neuroscience, Inc. v. Forrest, No. 12-CV-813, 2013 WL 6331348 at *2 (W.D. Wis. Dec. 5, 2013); see also Texas Ujoints, LLC v. Dana Holding Corp. Mach. Serv., Inc., No. 13-C-1008, 2013 WL 6230675 at *3 (E.D. Wis. Dec. 2, 2013).

The plaintiff asserts that he had a business relationship with KBT. Dkt. No. 35 at ¶129. He states that as a result of that relationship, he "had a reasonable expectation of economic gain," including bonuses and stock

24

options. Id. at ¶130. He claims that "iTeam, iStream, Biel, Tice, Gagerman, Axberg, Anderson, and Atwell intended to cause the destruction of or harm to Zillges' relationship with KBT." Id. at ¶131. The plaintiff argues that their "conduct was the proximate cause" of the termination of this business relationship. Id.at ¶132. Finally, the plaintiff argues that as a result of the termination of the relationship, he "has suffered loss of income and benefits, career opportunities, career progression, mental anguish, and emotional distress." Id. at ¶133.

In their motion for summary judgment, the defendants do not dispute that the plaintiff had a business relationship with KBT, based on an employment contract. Dkt. No. 72 at 24. The defendants argue, however, that they did not interfere with this relationship, because "iTeam, iStream, Biel, Anderson, and Atwell did not have a vote or vote on Zillge's termination," nor did they "mandate that Tice request Zillges's resignation or call a vote if he refuse[d]." Id. According to the defendants, Axberg, Tice and Gagerman made separate and independent decisions on whether to terminate the plaintiff. Id. Because the defendants allege that "Zillges was involved in and condoned an out-of-policy purchase of risky securities," they argue that it was that conduct which "motivated the defendants' respective actions relating to Zillges's termination, not some improper motive." Id. at 24-25. As a result, the defendants assert that they acted in good faith and with no wrongful motive. Id. at 25.

The last element of a claim for tortious interference with prospective business requires the plaintiff to prove "lack of privilege or justification for defendant's interference." <u>Forrest</u>, 2013 WL 6331348 at *2. The parties disagree, not only on whether the defendants were justified in interfering with the plaintiff's business, but on whether the defendants even interfered with that business at all. This is yet another genuine dispute regarding a material fact; the court will deny the defendants' motion for summary judgment as to Count IV of the amended complaint.

    4.    There is no genuine dispute regarding the material fact of whether the plaintiff was an "employee" under Wis. Stat. §109.03, and thus the court will grant the defendants' motion for summary judgment on Count VI, failure to pay wages.

Count VI of the amended complaint alleges that KBT violated Wis. Stat. §109.03 by failing to pay him wages accrued since his termination. Dkt. No. 35 at 22. Wisconsin law requires an employer to pay "[a]ny employee . . . who is discharged from employment . . . in full by no later than the date on which the employee regularly would have been paid under the employer's established payroll schedule or [monthly], whichever is earlier." Wis. Stat. §109.03. Wages include "remuneration payable to an employee for personal services, including salaries, commissions, holiday and vacation pay, overtime pay, severance pay or dismissal pay . . . bonuses and any other similar advantages agreed upon [by the parties] or provided by the employer . . . as an established policy." Wis. Stat. §109.01(3). The statute defines an "employee" as "any person employed by an employer, except that 'employee' *does not include* an officer or director of a

26

corporation . . . or a person employed in a[n] . . . executive . . . capacity . . . or in a capacity in which the person is privy to confidential matters involving the employer-employee relationship . . . ." Wis. Stat. §109.01(1r) (emphasis added).

According to the plaintiff, KBT has "fail[ed] to compensate [him] his unpaid wages since his termination." Dkt. No. 35-1 at 23. The defendants respond that as a matter of law, §109.03 does not afford the plaintiff a remedy, because he was not an "employee" of KBT, as that term is defined by the statute. Dkt. No. 72 at 25. Rather, the plaintiff served "as President, CEO, and Director of KBT." Id.

The plaintiff himself asserts in the amended complaint that he "served as KBT's President and Chief Executive Officer from October 11, 2011 until his termination on July 22, 2013." Dkt. No. 35 at ¶14. Thus, there is no genuine dispute that the plaintiff was an "officer or director" of KBT. Section 109.03 specifically provides that officer or directors are not employees, and the statute provides a remedy only for employees. Therefore, the court will grant the defendants' motion for summary judgment as to Count VI of the amended complaint.

In a footnote in his response to the defendants' motion for summary judgment, the plaintiff asks the court for leave to file a motion to amend the complaint if it finds that he "is unable to recover under Chapter 109 because he is not an 'employee.'" Dkt. No. 86 at 32 n.10. "Rule 15(a) provides that after a party has amended its pleading once by right, 'a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and

27

leave shall be freely given when justice so requires.'" <u>Airborne Beepers & Video, Inc. v. AT&T Mobility, LLC</u>, 499 F.3d 663, 666 (7th Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). "'The terms of the rule, however, do not mandate that leave be granted in every case.'" <u>Id.</u> (quoting <u>Park v. City of Chicago</u>, 297 F.3d 606, 612 (7th Cir. 2002)). A court should not grant leave if it finds that it would result in "undue delay," that the plaintiff has demonstrated "bad faith or dilatory motive[s]," that the movant has "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed," or that it would cause "undue prejudice to the opposing party." <u>Id.</u> (quoting <u>Forman v. Davis</u>, 371 U.S. 178, 182 (1962)).

The plaintiff amended the complaint once, and moved to amend a second time. The court denied the motion to file a second amended complaint. Dkt. No. 34. Now, in a footnote in a document filed nine months after the court denied the second motion to amend, the plaintiff makes the equivalent of a third motion to amend, seeking to re-allege the claim as a claim for breach of contract against KBT. He argues that he ought to be able to do this because "Defendants have previously acknowledged that they believe Zillges' employment contract governs this claim." Dkt. No. 86 at 32 n.10.

The plaintiff had the opportunity to allege a breach of contract claim against KBT in his original complaint in November 2013, and again in the amended complaint in June 2014. He could have pled the §109.03 claim and the breach of contract claim in the alternative. Instead, he elected to bring only the §109.03 claim, and seeks to bring the breach of contract claim only after the defendants pointed out a flaw in the claim he chose to bring.

This effort flouts the goals of the Rules of Civil Procedure, which "provide that they are to be construed to secure the just, speedy, and inexpensive determination of every action." <u>Forman</u>, 371 U.S. at 182 (citing Fed. R. Civ. P. 1) (internal quotation marks omitted). The court will not allow the plaintiff leave to file a third amended complaint.

> 5. There is no genuine dispute as to any material fact regarding the plaintiff's claim in Count VIII that defendant iStream was unjustly enriched, and thus the court will grant the defendants' motion for summary judgment as to Count VIII.

Count VIII of the amended complaint alleges that iStream would be unjustly enriched if it were allowed to retain the benefits of the plaintiff's services without paying him. Dkt. No. 35 at 24. A successful action for unjust enrichment requires the plaintiff to show (1) that he "conferred" a benefit on the defendant; (2) that the defendant "appreciated" the benefit; and "(3) 'acceptance and retention' of the benefit by the defendant, under circumstances such that it would be 'inequitable to retain the benefit without payment of the value thereof.'" <u>Fail Safe LLC v. A.O. Smith Corp.</u>, 762 F. Supp. 2d 1126, 1129 (E.D. Wis. 2011) (quoting <u>Seegers v. Sprague</u>, 70 Wis. 2d 998, 1004 (1975)). However, "The doctrine of unjust enrichment does not apply where the parties have entered into a contract." <u>Cont'l Cas. Co. v. Wisconsin Patients Comp. Fund</u>, 164 Wis. 2d 110, 118 (Ct. App. 1991) (citing <u>Watts v. Watts</u>, 137 Wis. 2d 506, 530 (1987)). "Rather, an action for recovery based upon unjust enrichment is grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such benefit

29

would be unjust." <u>Watts</u>, 137 Wis. 2d at 530 (citing <u>Puttkammer v. Minth</u>, 83 Wis. 2d 686 (1978)).

The plaintiff alleges that he and "iStream entered into the Bonus agreement pursuant to which" he conferred a benefit on the defendant by "render[ing] valuable services . . . including progress toward removing the Consent Orders." Dkt. No. 35 at ¶153. He states that the defendant "would be unjustly enriched if allowed to retain the benefits of [his] services without paying" the $25,000 that remains unpaid from the 2012 bonus and the $30,000 remaining from the consent-order bonus. <u>Id.</u>

The plaintiff's own characterization of his claim concedes that his relationship with iStream was based on the "Bonus agreement"—a contract. Because Wisconsin law does not recognize a claim for unjust enrichment based on a contract or agreement between parties, the court will grant the defendants' motion for summary judgment as to Count VIII of the amended complaint.

> 6. There are genuine disputes of material fact regarding the plaintiff's claims that defendants Biel (Count IX) and Tice (Count X) defamed him, and thus the court will deny the defendants' motion for summary judgment as to Counts IX and X.

The plaintiff's amended complaint contains two defamation claims—one against defendant Kenneth Biel, the other against defendant Thomas Tice. Dkt. No. 35 at 24-26. In Count IX, the plaintiff claims that "[i]n or about August 2013, Defendant Biel made several false statements to iTeam employees about Zillges, including that Zillges made false statements to the FDIC and was

30

personally responsible for the FDIC's finding of 23B violations." Id. at 25. He

further alleges that since the plaintiff's termination, Biel made statements that

the plaintiff "over exaggerated and made misrepresentations in his reports to

the FDIC to KBT employees." Id. The plaintiff claims that Biel's statements have

caused him to suffer damages. In Count X, the plaintiff claims that "[f]rom time

to time since July 22, 2013, Defendant Tice made false statements about

Zillges to the FDIC, KBT employees, and KBT board members." Id. Again, he

argues that these statements caused him to suffer damages. Id. at 26.

   To prevail on a state-law defamation claim, the plaintiff must show the

existence of "a false and defamatory statement concerning another, an

unprivileged publication to a third party, and fault amounting to at least

negligence on the part of the publisher." Bostwick v. Watertown Unified Sch.

Dist., No. 13-C-1036, 2015 WL 520701 at *13 (E.D. Wis. Feb. 9, 2015) (citing

Bay View Packing Co. v. Taff, 198 Wis. 2d 653, 673 (Ct. App. 1995)). "A

defamatory statement . . . 'tends to harm one's reputation so as to lower him or

her in the estimation of the community or to deter [a] third person from

associating with him or her.'" Id. (quoting Mach v. Allison, 259 Wis. 2d 686,

698-99 (Ct. App. 2002)). In Wisconsin, the person claiming that another person

has defamed him or her "must first establish that the words are not true and

are capable of a defamatory meaning." Terry v. Journal Broad. Corp., 351 Wis.

2d 479, 500-01 (Ct. App. 2013) (internal quotation marks and citation omitted).

Courts have to look at the "language" and determine if "the words . . . in the

plain and popular sense in which they would naturally be understood" are

defamatory. Id. (internal quotation marks and citations omitted). This requires an analysis of "[t]he context and circumstances in which the statements were made." Id. (citation omitted).

In the defendants' motion for summary judgment, defendant Biel asserts that the plaintiff does not have any personal knowledge of whether Biel made the statements the plaintiff claims he made, provides no testimony supporting the allegations, and attaches no evidence that Biel ever made such claims. Dkt. No. 72 at 27. The defendants ask the court to dismiss the defamation claim due to lack of evidence.

This argument sounds to the court like a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). The time has long passed for filing such a motion. This is a summary judgment motion; the standard the court applies is not whether there is evidence sufficient to support a claim, but whether a genuine dispute exists as to a material fact. The court will not dismiss the defamation claim against Biel.

The defendants make a similar argument with regard to the Count X allegations against Tice. The defendants argue that the plaintiff has not pled the actual statements, and they urge the court to dismiss Count X for failure to state a claim. Dkt. No. 72 at 28.

The court construes the defendants' allegation that the plaintiff provides no evidence that Biel made these statements as a constructive denial that he did so. This constitutes a genuine dispute as to a material fact. The court will

deny the defendants' motion for summary judgment as to Count IX of the amended complaint.

The defendants are correct that the plaintiff fails to provide the actual language used in these allegedly defamatory statements. Instead, the plaintiff generally describes the statements made by both Tice and Biel. Dkt. No. 35 at 17-18. He does not provide the statements in his proposed statement of undisputed facts. Dkt. No. 77. He did not quote the alleged defamatory language in his proposed findings of fact filed in support of his opposition to the defendants' motion for summary judgment. Dkt. No. 88.

But again, this is not a motion to dismiss for failure to state a claim, and the time for filing such a motion has passed. Further, in support of their argument that the court should dismiss Count X because the plaintiff didn't plead the actual statements, the defendants cite Wis. Stat. §802.03(6), the Wisconsin statute that requires heightened pleading for libel and slander. The Wisconsin statute does not govern the pleading standard in federal court. ". . . [i]t is well settled that a federal court sitting in diversity applies federal pleading requirements even when the claim pleaded arises under state rather than federal law." Wesbrook v. Ulrich, No. 13-CV-494, 2014 WL 811786 at *7 (W.D. Wis. Mar. 3, 2014) (quoting Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc., 536 F.3d 663, 670 (7th Cir. 2008), and citing Schindler v. Marshfield Clinic, No. 05-C-705-C, 2007 WL 60924 at *11-12 (W.D. Wis. Jan. 4, 2007) "federal courts apply state law to resolve substantive questions

33

and federal law to resolve procedural and evidentiary issues, which includes pleading requirements"). The court will not dismiss Count X.

The defendants also argue that "[Tice's] statements, if made, were true," and "truth is an absolute defense." Dkt. No. 72 at 28. (citations omitted). The defendants are correct that "truth is an absolute defense to a defamation claim." Thermal Design, Inc. v. Guardian Bldg. Prods., Inc., No. 08-C-828, 2012 WL 2254195 at *11 (E.D. Wis. June 15, 2012) (citing Anderson v. Hebert, 798 N.W.2d 275, 280 (Ct. App. 2011)). See also Taylor v. Carmouche, 214 F.3d 788, 795 (7th Cir. 2000). The plaintiff, however, alleges in the amended complaint that the statements were *not* true. Dkt. No. 35 at 25. There is a genuine dispute as to this material fact, which precludes the court from granting summary judgment on Count X of the amended complaint.

### D. The court will deny the plaintiff's motion for summary judgment.

1. There are genuine disputes of material fact regarding the plaintiff's claim in Count I that defendant KBT violated the Federal Deposit Insurance Act, and thus the court will deny the plaintiff's motion as to Count I.

The plaintiff argues that the court should grant summary judgment in his favor on Count I of the first amended complaint because his statements to the FDIC "were a contributing factor in his termination." Dkt. No. 76 at 9. The plaintiff himself acknowledges, however, that the defendants gave four other reasons for terminating him: "1) the unauthorized purchase of trust-preferred securities; 2) the taking of an unauthorized bonus; 3) inherent conflict of interest due to [the plaintiff's] desire to buy [KBT]; and 4) his handling of the alleged violation of 23(b)." Dkt. No. 76 at 10. As the court already has

34

determined in denying the defendants' motion for summary judgment on Count I, a genuine dispute exists as to this material fact, precluding the court from granting summary judgment in the plaintiff's favor.

The parties also dispute the nature of the statements that the plaintiff made to the FDIC. While the plaintiff asserts that he reported violations of the Federal Reserve Act, the defendants allege that those statements were "false" and that the plaintiff made the "false statement[s] knowingly and recklessly." Dkt. No. 92 at 5.

As the court discussed in section IV(C)(1) above, in order to prove that KBT violated the Federal Deposit Insurance Act, the plaintiff must show that he made statements to the FDIC, that the defendants knew about those statements, and that the statements played a role in the retaliatory conduct, here Zillges' termination. The parties agree that the plaintiff made statements to the FDIC and that the defendants knew about the conversations between Zillges and the FDIC. But the parties strongly disagree about the role those statements played in in the plaintiff's termination, and about the nature of the statements. Again, the parties' motions and accompanying pleadings demonstrate the existence of a genuine dispute regarding these material facts. Therefore, the court will deny the plaintiff's motion for summary judgment on Count I of the first amended complaint.

> 2. There is no genuine dispute regarding the material fact of whether the plaintiff was an "employee" under Wis. Stat. §109.03, and thus the court will deny the plaintiff's motion for summary judgment on Count VI, failure to pay wages.

In his motion for partial summary judgment, the plaintiff seeks judgment on Count VI of the complaint for his "accrued and unused vacation pay." Dkt. No. 75 at 15. He seeks this compensation under Wis. Stat. §109.03. In addition, he seeks attorney fees under Wis. Stat. §109.03(6). As a matter of law he cannot recover either of these monies, because he was not an "employee" as defined in §109.01(1r).

> 3. There are genuine disputes of material fact regarding iStream's allegations of misrepresentation in the first, second and third causes of action in the counterclaim, and thus the court will deny the plaintiff's motion for summary judgment on the first and third cause of action.

iStream's counterclaim focuses on whether the plaintiff made a misrepresentation when he told defendant Axberg in a June 20, 2013 email that the regulators lifted the November 13, 2012 consent order, in order to induce iStream to pay him the $30,000 compliance bonus due under the bonus agreement between the plaintiff and iStream. Dkt. No. 7 at 41-43.

In the first cause of action of its counterclaim, iStream alleges that the plaintiff committed theft by false representation. Id. at 41. iStream alleges that on June 20, 2013, the plaintiff falsely represented to defendant Axberg that one of the consent orders had been lifted, and that the plaintiff knew that wasn't true when he made the representation. Id. In the second cause of action in the counterclaim, iStream alleges that this same statement constituted a negligent misrepresentation. Id. at 42. In the third cause of action of the counterclaim,

36

iStream alleges that this same June 20, 2013 statement constituted an intentional misrepresentation. <u>Id.</u> at 43.

Under Wisconsin law, a person commits theft by false representation when he or she "[o]btains title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." Wis. Stat. §943.20(1)(d). If, as a result of the false representation committed in violation of §943.20, the person "suffer[ed] damage or loss by reason of intentional conduct that occur[ed] on or after November 1, 1995," the victim "has a cause of action against the person who caused the damage or loss." Wis. Stat. §895.446(1).

To find liability for civil theft under Wis. Stat. §895.446(1), "a court must first find the existence of a theft under Wis. Stat. §943.20(1)(d)." <u>Cousins Submarines, Inc. v. Fed. Ins. Co.</u>, No. 12-CV-387, 2013 WL 494163 at *9 (E.D. Wis. Feb. 8, 2013). Under §895.446(2), "[t]he burden of proof . . . is with the person who suffers damage or loss . . . by a preponderance of the credible evidence," and "[a] conviction under . . . §943.20 . . . is not required to bring an action, obtain a judgment, or collect on that judgment under this section." Wis. Stat. §895.446(2). Theft by false representation is a specific intent crime. <u>Tri-Tech Corp. of Am. v. Americomp Servs., Inc.</u>, 254 Wis. 2d 418, 432-33 (2002).

37

To prove negligent misrepresentation, a plaintiff must show:

> (1)    a duty of care or voluntary assumption of a duty on the part of [Zillges]; (2) a breach of that duty, i.e., failure to exercise ordinary care in making the representation or in ascertaining the facts; (3) a causal link between the conduct and the injury; and (4) actual loss or damage as a result of the injury.

Hatleberg v. Norwest Bank Wisconsin, 283 Wis. 2d 234, 255-56 (2005). This claim "has been described as requiring that: (1) defendant made a factual representation; (2) which was untrue; (3) which plaintiff believed to be true and relied on to his/her detriment; and (4) defendant breached his duty of care to plaintiff in making the representation." Ramsden, 223 Wis. 2d at 721 (citation omitted). "Reliance . . . is equivalent to the causation element." Id.

To prove an intentional false representation or an intentional misrepresentation, iStream must prove

> (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

Ramsden v. Farm Credit Servs. N. Cent. Wis. ACA, 223 Wis. 2d 704, 718-19 (Ct. App. 1998) (citation omitted). See also Kaloti Enters., Inc. v. Kellogg Sales Co., 283 Wis. 2d 555, 569 (2005).

Each of iStream's three misrepresentation claims turns on the plaintiff's knowledge and intent at the time he informed Axberg that the regulators had lifted the November 2012 consent order. For an intentional misrepresentation,

38

"the defendant must either have known the representation was untrue or have made the representation recklessly without caring whether it was true or false" and he "must have made the representation with the intent to deceive and induce the plaintiff to act . . . to the plaintiff's pecuniary damage." Lewis v. Paul Revere Lift Ins. Co., 80 F. Supp. 2d 978, 1000 (E.D. Wis. 2000) (citation omitted). For negligent misrepresentation, he "must have failed to exercise ordinary care in making the representation or in ascertaining the facts." Id. (citation omitted).

The parties have presented competing evidence on the question of what the plaintiff knew, and what he intended. This competing evidence demonstrates that there are genuine disputes as to these material facts. And again, determining intent requires the court to make a credibility determination; "[o]n summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder." Payne, 337 F.3d at 770 (citations omitted). For these reasons, the court will deny the plaintiff's motion for summary judgment as to the first, second and third causes of action alleged in iStream's counterclaim.

> 4. There are genuine disputes of material fact regarding the fourth cause of action in iStream's counterclaim, alleging that the plaintiff committed conversion by accepting and using the $30,000 compliance bonus, and thus the court will deny the plaintiff's motion for summary judgment on the fourth cause of action.

The fourth cause of action in iStream's counterclaim alleges that when the plaintiff accepted the $30,000 compliance bonus despite "the bonus not

39

being payable" and converted that money to his own use, he committed conversion. Dkt. No. 7 at 44. "The elements of tortious conversion comprise: (1) intentionally controlling/taking property belonging to another; (2) controlling/taking property without the owner's consent; and (3) those acts resulting in serious interference with the rights of the owner to possess the property," but this "does not include wrongful intent or knowledge that what is being taken rightfully belongs to another." Bruner v. Heritage Cos., 225 Wis. 2d 728, 736-37 (Ct. App. 1999). The element in dispute is consent: the plaintiff argues that "Axberg considered the matter and decided to pay the bonus," Dkt. No. 76 at 23, while iStream asserts that it could not have consented, because Axberg based his decision to pay the bonus on the plaintiff's alleged misrepresentation, Dkt. No. 92 at 28. Yet again, a genuine dispute of material fact exists. Yet again, the determination of whether Axberg's decision was based on a misrepresentation requires a credibility determination reserved for the finder of fact. The court will deny the plaintiff's motion for summary judgment on the fourth cause of action of iStream's counterclaim.

    E.    <u>Defendants' Request to Dismiss Biel as a Defendant</u>

On November 17, 2014, the defendants filed a suggestion of death in compliance with Fed. R. Civ. P. 25. Dkt. No. 52. The pleading indicated that defendant Kenneth W. Biel had passed away on November 14, 2014, <u>id.</u>; attached was an obituary confirming that fact, Dkt. No. 52-1.

As discussed above, the amended complaint contains three claims against defendant Biel: Count III (conspiracy to injure business), Count IV

40

(tortious interference with business), and Count IX (defamation). In their motion for summary judgment, the defendants ask the court to dismiss defendant Biel, because his death extinguished all of the claims against him. Dkt. No. 72 at 28-29.

"Whether an action survives the death of a party must be determined by looking to the law, state or federal, under which the cause of action arose." Schimpf v. Gerald, Inc., 2 F. Supp. 2d 1150, 1153 (E.D. Wis. 1998) (citing Cont'l Assurance Co. v. Am. Bankshares Corp., 483 F. Supp. 175, 177 (E.D. Wis. 1980)). See also, Spence v. Staras, 507 F.2d 554, 557 (7th Cir. 1974) ("In a federal civil rights action where the person who has been deprived of his rights has died, the action survives for the benefit of the estate if the applicable state law creates such a survival action.")

Each of the three claims against defendant Biel arises under Wisconsin law. In 2008, Wisconsin's survival statute, Wis. Stat. §895.01, went into effect. The statute is entitled "What actions survive; actions not to abate." Subsection (1)(am) states that, "[i]n addition to the causes of action that survive at common law, all of the following also survive," and provides a list of causes of action that live on after a party's death. The defendants assert that "[a]t common law, torts do not survive the death of a defendant," citing Howard v. Lunaburg, 192 Wis. 507, 213 N.W. 301 (Wis. 1927). Thus, they assert, the three tort claims the plaintiff has asserted do not survive him.

What the Howard case actually says is that "[a]t common law tort actions did not survive," id. at 213 N.W. at 302. Immediately following that statement,

41

the Howard court proceeded to look at the Wisconsin survival statute in effect at that time, "to see if [the cause of action at issue] has been taken out of the common-law rule." Id.

Wis. Stat. §895.01 does not list conspiracy to injure reputation or business, tortious interference with prospective business, or defamation. "It is well settled that the list of causes enumerated in sec. 895.01(1) is exclusive because 'it was never the legislative intent that all actions should survive.'" Pettygrove by Scholl v. Pettygrove, 132 Wis. 2d 456, 463 (Ct. App. 1986) (quoting Hanson v. Valdivia, 51 Wis. 2d 466, 471 (Wis. 1971)). Wisconsin courts have held that actions such as divorce, paternity and infliction of emotional distress do not survive because they are not specifically enumerated in the §895.01 list. See Socha v. Socha, 183 Wis. 2d 390, 394 (Ct. App. 1994) (divorce action does not survive because not enumerated in §895.01); In re Estate of Blumreich, 84 Wis. 2d 545, 554 (1978) (paternity actions do not survive because not enumerated); Estate of Riddle v. Cincinnati Ins. Co., 183 Wis. 2d. 428, 1994 WL 88352 at *5 (Ct. App. 1994) (claims for infliction of emotional distress not authorized, and "as torts purely personal in nature," would not survive under common law).

The plaintiff argues, however, that the three causes of action he alleged against Biel survive under Wis. Stat. §895.01(8), which provides for the survival of "[c]auses of action for all damage done to the property rights or interests of another" to survive. As far as the court can tell, no Wisconsin court

42

has ruled on subsection (8) of the survival statute. Wisconsin courts have, however, opined on the meaning of "property rights or interests."

In <u>John V. Farwell Co. v. Wolf</u>, 96 Wis. 10, 20 N.W. 289, 292 (Wis. 1897), the Wisconsin Supreme Court stated that the phrase "must be confined to damages done to some specific personal estate of which one may be the owner." In <u>Lane v. Frawley</u>, 102 Wis. 373, 78 N.W. 593, 596 (Wis. 1899), the same court held that "an action of deceit, to recover pecuniary damages not to specific property, does not survive the death of the party injured . . . ." In <u>Howard v. Lunaburg</u>, the court held that "[b]y property rights or interests was undoubtedly meant, a right or interest of value, that could be parted with for some pecuniary consideration, or, if lost or impaired, would pecuniarily diminish the estate of the [deceased party]." In <u>Hanson v. Valdivia</u>, 51 Wis. 2d at 474 (1971), the court found that a husband's right to consortium was not a "property right or interest," because it was "a purely personal right arising from the marriage contract and any damage to that right constitutes a purely personal wrong." 51 Wis. 2d at 474. In <u>P.C. Monday Tea Co. v. Milwaukee Cnty. Expressway Comm'n</u>, 24 Wis. 2d 107, 111 (1964), the court said, "the basic principle of survivability at common law was that wrongs which diminished property formed the basis of survivable actions while personal injuries did not . . . ."

The list goes on, but the consistent theme that runs through each of these decisions and others is that a "property right or interest" is a right or interest in some specific, quantifiable property which one could transfer or sell

43

to someone else for value. As the defendants point out in their reply brief, the plaintiff has not identified such property. The plaintiff could not sell, or transfer to someone else, his right not to have his business or reputation injured, or his right to future business, or his right not to be defamed.

The court disagrees with the plaintiff that the three claims he alleged against Biel survive under §895.01(8). Therefore, the court will dismiss defendant Biel. This requires the court to dismiss Count IX of the amended complaint, because Biel is the only defendant named in that claim.

## V.    CONCLUSION

The court **DENIES IN PART** and **GRANTS IN PART** the defendants' motion for summary judgment. Dkt. No. 70. The court **DENIES** the defendants' request for summary judgment as to Count I, Count III, Count IV, Count IX, and Count X of the amended complaint. The court **GRANTS** the defendants' motion for summary judgment as to Count VI and Count VIII of the amended complaint.

The court **DENIES** the plaintiff's motion for partial summary judgment. Dkt. No. 75. The court **DENIES** the plaintiff's motion for summary judgment as to Count I and Count VI of the amended complaint. The court further **DENIES** the plaintiff's motion for summary judgment on all four causes of action raised in iStream's counterclaim.

The court **DISMISSES** defendant Kenneth Biel. Because he is the only named defendant in Count IX of the amended complaint, the court **DISMISSES** Count IX.

The court **DENIES** the defendants' request for a declaratory ruling on the question of whether a plaintiff who prevails on a claim under 12 U.S.C. §1831j may recover attorneys' fees.

Dated at Milwaukee, this 29th day of September, 2015.

BY THE COURT:

_____

HON. PAMELA PEPPER
United States District Judge

45